1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9

10

11

12

13

14

| | |
|---|---|
| RANDOLPH EVANS, | 1:09-cv-2055 LJO SMS |
| Plaintiff, | ORDER ON MOTION FOR SUMMARY JUDGMENT (DOC 66) |
| v. | |
| SEARS LOGISTICS SERVICES, INC., SEARS, ROEBUCK & CO., SEARS HOLDINGS CORP., | |
| Defendants. | |

15

16

17

I. <u>INTRODUCTION.</u>

18

19

20

21

22

23

24

25

26

27

Defendants Sears Logistics Services, Inc. ("Sears" and/or "Defendant"), Sears Roebuck & Co. and Sears Holdings Corporation move for summary judgment against Plaintiff Randolph Evans ("Evans"). Evans, a Sears employee, asserts three claims against Defendants for age and disability discrimination, as well as a request for punitive damages. Defendants contend that the uncontroverted evidence establishes that Evans does not meet his burden of proof to show he was terminated for a discriminatory reason; Evans' termination was legitimate and based on a non-discriminatory reason; and Evans is unable to pursue punitive damages. Evans opposes the motion on all claims and his request for punitive damages. The Court GRANTS in part and

28

1

DENIES in part Defendants' summary judgment motion.[1]

## II. BACKGROUND.[2]

Sears Holdings Corporation is a holding company formed after the 2005 merger between Sears and K-Mart, and is the parent company of Sears, Roebuck and Co. The key employer in this matter, however, is Defendant Sears Logistics Services, Inc., which is a wholly-owned subsidiary of Sears, Roebuck and Co. Decl. of Cathy Miller ¶ 4. Sears employed Plaintiff in one of its seven retail replenishment centers.

Plaintiff is a sixty-five year old, African-American male. Pl. Dep., 25:19-20. Plaintiff first began working for Sears Roebuck and Co. in 1970 and has continuously worked at different Sears locations and in various positions throughout his career. *Id.* at 40:8-41:7. Evans' human resource career advanced in 1997 when he became the Southeast Region Human Resource Manager ("HRM"). *Id.* In 1999, he became the Region HRM for the South and held this position until fall 2004. *Id.* In these positions, Evans oversaw the human resource functions for multiple distribution centers. *Id.* at 42:23-44:11. While HRM for the South, Evans was supervised by Vicki Purvis. *Id.* at 42:17-18. In late 2004 Evans accepted the HRM position at the Delano, California retail replenishment center ("RRC") and worked in this position until his termination in September 2007. *Id.* at 41:5-7.

During the relevant time period, while employed as the Delano HRM, Plaintiff reported to the Area Human Resources Manager ("AHRM"). *Id.* at 141:10-17. When Plaintiff was initially placed in the Delano HRM role, his direct supervisor was John Hargrove. *Id.* at 124:6-10. Some

---

[1] Because oral argument was not of material assistance, the Court ordered these matters submitted on the briefs. E.D. Cal. L. R. 230 (g).

[2] The Court recognizes that Plaintiff objects to a significant amount of Defendants' undisputed facts on the grounds of "issue preclusion/document exclusion" pursuant to a motion for sanctions still awaiting decision. *See* ECF Nos. 36, 50. For purposes of this Order, the Court proceeds as though these motions are denied and Defendants' evidence is not excluded. However, if Plaintiff's motion(s) is/are later granted and the evidence used in deciding this Order becomes excluded, the Court is willing to consider a motion for reconsideration at that time.

Further, the Court acknowledges the remaining objections to Defendant's undisputed facts. Each objection was considered and sustained where meritorious. Otherwise, the objections are overruled.

time prior to July 2006, Hargrove was replaced by Don MacArthur. *Id.* at 173:20-23.

As an HRM, Plaintiff was expected to institute and provide strategic guidance on company-wide human resource policies in the Delano facility. *Id.* at 141:10-17; 143:6-7. His responsibilities included effectively training HR associates, providing consultative assistance to managers, ensuring the execution of corporate HR initiatives, and ensuring compliance with company polices. *Id.*

Plaintiff asserts that from 1970 to 2005, his performance record was never below expectations and he was frequently lauded by his supervisors, particularly Vicki Purvis and John Hargrove. However, in July 2006, Plaintiff contends, things "suddenly changed" when Beth Taska, age 42, became HR Director for Sears and Tania Williams, age 32, was promoted to AHRM and began directly supervising Plaintiff. Dep. of Tania Williams, 16:8-12; 25: 17-26:1.

A.     Plaintiff's Evidence of Discrimination.

        1.     Age-Related Statements.

Plaintiff asserts that Williams and Taska showed their discriminatory animus by making certain statements regarding Sears' older employees. In the middle of June 2006, in a meeting at the Sears corporate headquarters, Taska announced that long-service employees were "retired on the job." Decl. of Glen Shepherd ¶ 5. Kimberly Wade, a newly employed HRM, testified that in February 2007, Williams told her that Sears needed "newer, younger" HRMs.  Dep. of Kimberly Wade, 63:3. Also, that Evans would not be around much longer "because he was of retirement age and [Sears] needed, quote, fresh blood, end quote in the company." *Id.* at 61:22-25. During spring 2007conference calls, Williams repeated her statement that Sears needed "young" human resources personnel. *Id.* at 69:22-70:9. Additionally, on one of these conference calls, when Evans was not on the line, Williams said, "I guess the young people can remember the right time for the call." *Id.* at 94:25-95:8. Alex Gutierrez, Evans' assistant HRM, also testified that Williams

told him Evans was not going to be an HRM much longer because Sears needed "fresh blood" which Gutierrez believed meant "an external candidate" and/or a "younger person." Dep. of Alex Gutierrez, 123:20-22.

    2.    <u>Disability-Related Statements.</u>

In December 2006 Plaintiff informed Williams that he had been diagnosed with prostate cancer and that he would be receiving daily radiation treatments. Pl. Dep., 259:4-10. He further informed her that he would not be able to make the spring HR meeting because of his treatments, but that Gutierrez would attend the meeting in his place. Williams Dep., 177:4-14. Williams testified that she "understood and accepted" that Evans could not come to the meeting because of his treatment and that it would be a good opportunity for Gutierrez to gain HR experience. *Id.* However, Wade and Gutierrez both testified that at this meeting Williams criticized Evans for not attending. When Williams thanked the HRMs for attending, she said, "of course we have one person who didn't show up." Gutierrez Dep., 114:14-11; 117:4-118:14. She also stated: "one of us isn't here because he says he's sick." Wade Dep., 80:16-19; 81:1-4. And finally, Gutierrez testified that Williams stated to him: "We need somebody who is going to bring new ideas to the team. Randy can't even make it to these meetings." Gutierrez Dep., 118:3-14.

    3.    <u>Hiring An HRG.</u>

In October 2006, Williams informed Evans that Sears was creating a new human resources generalist ("HRG") position, which reported to the HRM. Pl. Dep., 157:12-19; 160:23-161:9. Plaintiff asserts that he immediately utilized several recruitment networks and identified several candidates early in the process, but soon after he told Williams about his cancer diagnoses, without providing any explanation, Williams informed him that she would take the lead in finding an HRG. *Id.* at 157:13-159:8; 178:1-7; 179:9-16. Plaintiff asserts this is because

4

Williams was interested in finding Evans' younger replacement. Williams hired Kimberly Handford, who is 17 years younger than Plaintiff. Dep. of Kimberly Handford, 8:17-18. Handford immediately replaced Evans upon his termination. *Id.* at 75:9-76:7.

        4.      <u>Termination of Other Employees Over 40.</u>

Plaintiff asserts that after Taska and Williams took control of the Sears Logistics HR department, they "immediately revealed their prejudice" against older employees by "getting rid" of three of the older HRMs within fifteen months. Plaintiff (age 61), Gwendolyn Chandler (age 60), and Glen Shepherd (age 58) were either terminated or "resigned under pressure." Shepherd Decl. ¶¶ 2, 3, 10; Decl. of Gwendolyn Chandler ¶¶ 2, 3, 6. All three were replaced by significantly younger employees, from 17 to 21 years younger than their predecessors. Siegel Decl., Ex. 21.

B.      <u>Legitimate Business Reason.</u>

Defendants argue that Evans was terminated for a non-discriminatory purpose. Defendants assert that after several performance issues, corrective actions and placement into a Performance Improvement Plan, Evans was terminated based on his continued failure to improve his performance.

        1.      <u>Evans' Pre-2006 Performance Issues.</u>

Defendants assert that Plaintiff's performance issues predate his supervision by Williams. For example, in 2005, Plaintiff received a disciplinary counseling memo for not following protocol regarding the termination of an employee who refused to take a drug test after a suspicious incident took place. Pl. Dep. 173:24-174:7, Ex. 28. Pursuant to Sears' Drug and Alcohol Abuse Policy, an employee must resign if he/she refuses to take a drug test and must be designated "not re-hireable." Handford. Decl. ¶ 7. However, in this instance after the employee

refused a drug test and resigned, Plaintiff did not follow protocol regarding the employee's designation, and the employee was re-hired against Sears' policy. Pl. Dep. 173:24-174:7, Ex. 28. Also in Plaintiff's 2005 Performance Review one of Plaintiff's supervisors, Don MacArthur, commented that Evans needed to be more assertive with the General Manager ("GM"), Mike Velten, regarding his HR concerns and needed to continue to "drive accountability" in order for his team to achieve the best results. *Id.* at 169:4-8, Ex. 27. Similar comments were echoed in Williams' 2006 reviews of Plaintiff. Williams Dep., 199:24-200:4, Ex. 14. Defendants assert that this demonstrates Plaintiff's performance issues were on-going and not a function of Williams' alleged discriminatory animus.

     2.    <u>Compliance Audit.</u>

Sears' compliance audits were implemented by Taska as a means of creating quantifiable compliance measures in the RRC HR departments. Dep. of Beth Taska, 17:21-18:9; 20:17-18; 21:1-13. Each HR manager received an audit checklist in advance so that he/she could prepare. Williams Dep., 103:17-18; 109:15-25, Ex. 5. Defendants assert that "[d]espite the advance notice. . . . Plaintiff had neglected to pull or review examples of the requested reports and files prior to the audit" and the paperwork that was pulled revealed "the Delano RRC was noncompliant with several company policies." Williams Dep. 112:16-117:1; 157:17-160:13. For example, "some part-time employees were permitted to exceed working part-time hours for several weeks, non-compliance with 1-9 documentation." *Id.*

     3.    <u>PIP</u>

In light of the issues with the audit, Williams decided to place Plaintiff on a Performance Improvement Plan ("PIP"). The PIP is an action plan that outlines desired performance results. If improvement is not made, the consequences can include termination. Velten Dep., 109:8-13;

Williams Dep., 203:11-24, Exh. 15. The PIP was set to last from October 25, 2006 to December 20, 2006, with a formal review of results by January 20, 2007. Williams Dep. 140:2-7; 203:11-24; Exs. 10, 15. However, in light of Plaintiff's cancer diagnosis, Williams suspended the progression of the PIP until he was released by his treating physician. *Id.* at 179:21-180:12. In March 2007, Evans completed his treatments and was released from care. Pl. Dep. 264:6-265:7, Ex. 34.

Once Plaintiff fully returned to work, Williams reviewed Plaintiff's 2006 Year-End Review with him. Williams Dep. 180:2-12. Defendants assert, however, that even with the continued coaching and assistance from Williams, Plaintiff failed to sustain significant improvement in his performance. For example, Velten, in his 2006 year-end feedback, made some complimentary comments, but also stated that Plaintiff "need[ed] to delegate more to his staff for execution." Velten Dep., 68:4-19. Further, Defendants state that Plaintiff's recruitment efforts were not up to par, disputing Plaintiff's version of events regarding the HRG position. The job description for the HRG position requires a candidate with at least three years of HR experience. Handford Dep., 13:12-18, Ex. 42. Plaintiff identified Gutierrez for the position, but Gutierrez had no prior HR experience. Williams Dep. 147:3-4. Defendants assert that rather than source a qualified candidate for the HRG role, Plaintiff simply identified an existing associate which "forced" Williams to recruit the candidate hired for the position; i.e., Williams hired Handford because of Plaintiff's lack of performance, not because she was looking for his younger replacement.

On or around April 24, 2007, Williams noted these issues and progressed Plaintiff to the second step of the PIP. Williams Dep. 311:10-18, Exs. 10, 46. Defendants assert that Evans continued to struggle. Specifically, Plaintiff incorrectly administered a PIP for an associate who had committed a safety violation rather than issuing a warning, which would have been the correct type of disciplinary action. *Id.* at 261:8-22. Defendants further assert that Plaintiff refused

to be more visible to the associates in the facility. *Id.* at 240:18-20. Plaintiff allowed the practice of not issuing final pay checks on an associate's last date of employment, even when those associates had provided sufficient notice of resignation, which exposed Sears to waiting time penalties. Handford Dep. 32:3-6; 33:10-35:3; 38:2-8; Ex. 44. Finally, Defendants assert that personnel files for the facility were in "complete disarray," intermingling basic personnel documents, such as job application and benefits elections, with medical-related documents, containing diagnoses from medical professionals, and 1-9 forms, in violation of various employee privacy protection laws. Handford Decl., ¶6.

Plaintiff was then moved to the third and final stage of the PIP on July 13, 2007. Williams Dep., 365:21-366:10, Exs. 15, 53. Defendants assert that during follow-up discussions with Plaintiff on July 25, 2007 and August 9, 2007, Plaintiff continued to struggle with routine requirements and basic HR compliance and did not correct problematic issues from the earlier audit. *Id.* at 317:14-22; 384:2-20; 387:16-388:5; 393:11-394:15; Exs. 46, 55, 56, 57, 58. Accordingly, Williams terminated Evans' on September 7, 2007. *Id.* at 72:14-18; 140:2-7; 274:22-275:12; Ex. 10.

C.     Plaintiff's Evidence of Pretext.

1.     Prior Satisfactory Performance Reviews.

Plaintiff asserts that any pre-2006 performance issues are not material. Plaintiff contends that in the 36 years before Williams and Taska were brought on, he never received a below satisfactory performance review, and accordingly it "defies belief" that Evans would suddenly become incompetent. Plaintiff cites his former supervisor, Vicki Purvis who states that Evans' "communication skills were excellent, he never needed to be micro-managed, and he required very little specific direction and training. He had a great rapport with all of his colleagues, supervisors, and subordinates." Decl. of Vicki Purvis ¶ 5. Evans "was always on top of the latest

8

human resources processes, and he knew them very well." *Id.* at ¶ 7.

Further, while Plaintiff admits he received a 2005 disciplinary memo and a few negative comments on his 2005 Performance Review, he points out that he ultimately received at least a satisfactory score in every category of his 2005 Review and received several positive comments as well, including that he "had a successful year" and was "well placed/pro." Hargrove Dep., 122:18-22; Ex. 27.

### 2.   Audit.

Plaintiff asserts that the October 2006 audit was not stopped because Plaintiff and his team were unprepared. He testified: "[T]here was no pulling of documents for the compliance review. It was preparation in all of the routine H.R. activities you do in the office." Pl. Dep. 186:2 – 188:2. Plaintiff states that the only reason Williams gave for stopping the audit was because one report of many, which became ready on the day of the audit, was not printed at that time. *Id.*

Further, Plaintiff asserts that any problems with the audit were corrected after a follow-up audit in the beginning of July 2007 and both Evans and Gutierrez agree that Williams said Delano passed the audit and everything was "good to go." Gutierrez Dep., 73:4-24.

### 3.   PIP.

Plaintiff asserts that the PIP was merely a pretext for several reasons. First, Evans asserts the PIP was created without his knowledge, which is a violation of Sears' performance improvement process. *See e.g.,* Hargrove Dep. 44:23-46:24 (Answering affirmatively that the first step in the PIP process is to have an initial meeting with the individual being placed on the PIP). Plaintiff asserts he was not aware of the PIP until around April 27, 2007 - *after* the original PIP time period had ended. Pl. Dep., 293:2-3. Further, Plaintiff asserts that the reasons listed in the PIP for his termination are at odds with the objective evidence, specifically Sears' HR

9

Scorecards. The HR Scorecards served as "measures of objective standards" to "quantify what [HR personnel] were doing in the field." Taska Dep. 19:16 – 22:9. Taska deemed the Scorecards the "most dramatic" and "full process" measuring HR accountability. *Id.* Each month every Sears distribution center was evaluated and measured regarding, *inter alia*, "I-9 compliance. . . . Turnover of. . . hourly staff. The length of time to fill a position. . . . [B]asic measurements of engagement and compliance of the law." *Id.* at 21:23-22:2. These categories corresponded to the categories on Sears' employee reviews and the PIP. The Scorecards, from their implementation in January 2007 until Plaintiff's termination in early September 2007, show that the Delano RRC was doing as well as, if not better than, the other six RRCs (all with younger HRMs) in many if not all categories. Pl.'s Decl., Ex. 1. However, in many categories these results were inconsistent with what was written in Plaintiff's reviews and the PIP.

Finally, Plaintiff specifically refutes many of the individual complaints listed in the PIP. For example, Plaintiff claims that he sufficiently "pushed back" against GM Velten, citing Gutierrez's testimony that Plaintiff made his opinions known, was not afraid to "battle" Velten, and "held his own." Gutierrez Dep., 36:25-37:25; 106:3-107:9. Plaintiff asserts he held associates accountable, by, *inter alia*, requiring weekly reports from associates, moving associates if they were not a good fit, and terminating employees when necessary. Purvis Decl. 5-6; Purvis Dep. 93:11-97:2.  Further, as an additional example, Plaintiff cites Velten's feedback regarding Evans' 2006 year-end review, which states that Delano's "source and recruit top talent" goals were met, yet on the on the corresponding Performance Review Williams rated Plaintiff a "2.0 low contributor" and all comments are negative. *Compare* Velten Dep. 89:4-12; Ex. 13 (email feedback); *with* Williams Dep. 140:2-7; 199:24-200:7; Exs. 10 (PIP), 14 (Plaintiff's 2006 Year-End Review).

III. <u>STANDARD OF DECISION.</u>

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see also*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving party bears the burden of proof at trial. *Id.* at 322. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial*." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (*quoting* Fed.R.Civ.P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor, but "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differ-ing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own affidavits, or

11

by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial." *Id.* "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

## IV. DISCUSSION.

A.    Age Discrimination (Claims One and Three).

1.    Legal Framework: FEHA.

The California Fair Employment and Housing Act ("FEHA") prohibits an employer from discriminating against any person "in terms of compensation or in terms, conditions, or privileges of employment" on the basis of specified protected classes, including age.  Cal. Gov't Code § 12940(a). FEHA cases are evaluated using the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination based on a theory of disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005).

Under the *McDonnell Douglas* test, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Scotch v. Art Institute of California-Orange*, 173 Cal. App. 4th 986, 1004 (2009). To meet this burden, the plaintiff must, at a minimum, show the employer took actions from which, if unexplained, it can be inferred that it is more likely than not that such actions were based on a prohibited discriminatory criterion. *Id.* A prima facie case generally means the plaintiff must provide evidence that (1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position he sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination,

12

demotion, or denial of an available job, and (4) some other circumstance suggests a discriminatory motive; i.e., evidence that the plaintiff was replaced by someone significantly younger than the plaintiff. *Id.* "The prima facie burden is light; the evidence necessary to sustain the burden is minimal." *Sandell v. Taylor-Lustig, Inc.*, 188 Cal. App. 4th 297, 310 (2010).

If the plaintiff establishes a prima facie case, then a presumption of discrimination arises, and the burden shifts to the employer to rebut the presumption by producing admissible evidence sufficient to raise a genuine issue of material fact the employer took its actions for a legitimate, nondiscriminatory reason. *Id.* If the employer meets that burden, the presumption of discrimination disappears, and the plaintiff must challenge the employer's proffered reasons as pretexts for discrimination or offer other evidence of a discriminatory motive. *Id.*

2. Legal Framework: ADEA.

"Under the ADEA, employers may not 'fail or refuse to hire ... any individual [who is at least forty years old] or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 811 (9th Cir.2004) (*quoting* 29 U.S.C. § 623(a)(1)). To establish an ADEA claim, a "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employment decision." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 (2009).

Under "but-for" causation, a plaintiff must show that age was "the reason" for the adverse employment action; there is no ADEA liability for "mixed motive" employment actions. *See id.* at 2350, 2352. "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.* at 2352. However, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any

13

1   other ADEA disparate-treatment action." *Id.* at 2351.

2

3       3.      Direct Evidence.

4       California has adopted the rule that the *McDonnell Douglas* test does not apply when the

5   plaintiff presents direct evidence of discrimination. *Trop v. Sony Pictures Entertainment, Inc.*,

6   129 Cal. App. 4th 1133, 1144 (2005) (*quoting Trans World Airlines, Inc. v. Thurston,* 469 U.S.

7   111, 121 (1985). The *Trans World* court reasoned that "[t]he shifting burdens of proof set forth in

8   *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the

9

10  unavailability of direct evidence.' [Citation.]" *Trans World*, 469 U.S. 121. Thus, there is no need

11  to engage in this burden-shifting analysis where there is direct evidence of discriminatory animus.

12  *Trop*, 129 Cal. App. 4th 1144–1145. A plaintiff may prove employer liability under the ADEA

13  through direct evidence as well. *Gross*, 129 S.Ct. at 2351.

14

15      4.      Analysis.

16          a.      Direct Evidence of Discrimination.

17      Plaintiff asserts that Taska's and Williams' statements are direct evidence of

18  discrimination which defeat summary judgment. "Direct evidence is evidence which, if believed,

19  proves the fact of discriminatory animus without inference or presumption. Comments

20  demonstrating discriminatory animus may be found to be direct evidence if there is evidence of a

21  causal relationship between the comments and the adverse job action at issue." *DeJung v.*

22

23  *Superior Court*, 169 Cal. App. 4th 533, 550 (2008) (*citing Trop*, 129 Cal. App. 4th 1146–1149). It

24  is "smoking gun" evidence, which is tantamount to an admission by the decision maker that the

25  adverse employment decision was based on the plaintiff's age. *Heard v. Lockheed Missiles &*

26  *Space Co.*, 44 Cal.App.4th 1735, 1748 (1996); *see, e.g., DeJung*, 169 Cal. App. 4th at 550

27  (statement by decision maker that "Ted's a great guy, but we're looking for someone younger").

28

14

Plaintiff points to the deposition testimony of Wade and Gutierrez who both testified that Williams made statements about her desire to replace Evans with a younger HR employee. Wade testified that Williams stated several times, to her personally and in conference calls, that she wanted "newer," "younger" HR personnel. Wade Dep. 63:3. Wade  also testified that Williams stated, "she did not foresee [Evans] remaining with Sears for much longer because he was of retirement age and [Sears] needed, quote, fresh blood, end quote in the company." Wade Dep. 61:22-25. Further, Gutierrez testified that Williams stated Sears needed "fresh blood."  Gutierrez Dep. 123:20-22.

However, Williams' statements must prove discriminatory animus without inference or presumption and they must be tied to Evans termination. Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2007). Here, neither witness testified that Williams intended to *terminate* Evans in order to replace him with a younger person. *See, e.g.,* Wade  Dep. 64:12-16 ("if I'm understanding your question, you're asking me if [Williams] said specifically that she was going to get rid of Evans. No, she didn't say that."). Both witnesses inferred that Williams was stating once Evans *voluntarily retired*, Williams would replace Evans with *either* a person who did not currently work for Sears - i.e., an "external" person - and/or a younger person. *See e.g.,* Wade  Dep. 80:3-6 ("I didn't think [Evans'] job was in jeopardy."); Gutierrez Dep.  122:7-8 ("I left [the conversation with Williams] under the assumption that [Evans] might be retiring."); *see also id.* at 123:20-22 (Gutierrez responding that he believed Williams' comment regarding "fresh blood" meant hiring "an external candidate" and/or a younger person). Further, Gutierrez stated that Williams' comments "could have meant numerous things." Gutierrez Dep., 124:12. According to Plaintiff's cited testimony, Williams' statements do not prove, without inference or presumption, that Williams intended to terminate

15

1    Evans based on his age.

2

3         b.    Prima Facie Showing.

4         Defendants do not challenge prima facie factors one, three or four. However, Sears takes

5    issue with factor two, arguing that Evans was not performing competently.

6

7              (1)    A Material Dispute Exists As to Whether Evans Was Performing
                       Competently.

8         A dispute exists regarding the standard on the second prima facie prong. Evans claims that

9    he must only provide evidence that he was *qualified* for the position he was in, while Defendants

10   assert Evans must provide evidence that he was *performing competently* in the position held.

11        The standard on the second prong is: "[the plaintiff] was qualified for the position he

12   sought or was performing competently in the position he held." *Guz v. Bechtel Nat. Inc.*, 24 Cal.

13   4th 317, 355 (2000). In this case Evans was not "seeking" any position; accordingly, the first

14   clause of the prong-two standard does not apply. Instead, the latter clause applies and Evans must

15   show that he was performing competently in the position he held. *See Gibbs v. Consolidated*

16   *Services*, 11 Cal. App. 4th 794, 799 (2003) (stating the second prong as: "[the plaintiff] was

17

18   performing satisfactorily").

19        In order to perform satisfactorily, "[the] plaintiff must demonstrate some basic level of

20   competence at his or her job." *Sandell*, 188 Cal. App. 4th at 322. "A plaintiff's burden in making

21   a prima facie case of discrimination is not intended to be 'onerous,'" *id.*, only a "minimal

22   showing [is] needed." *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 660 (9th Cir.

23   2002). This step is designed to eliminate at the outset the most patently meritless claims." *Guz,* 24

24   Cal. 4th at 354.

25

26        "[A]ny measurement of such competency should, to the extent possible, be based on

27   objective, rather than subjective, criteria." *Sandell*, 188 Cal. App. 4th at 322. However, a

28

plaintiff's self-assessment of his or her performance is relevant to make a prima facie case. *See,* *Aragon*, 292 F.3d at 660.[3]

> (2)   Plaintiff Presents Sufficient Evidence to Defeat Summary
>       Adjudication Re: A Prima Facie Case.

Sufficient evidence exists that Evans was performing competently in his job. For example, objective evidence, namely the HR Scorecards from their implementation in January 2007 until Plaintiff's termination in early September 2007, show that the Delano RRC was doing as well as, if not better than, the other six RRCs (all with younger HRMs) in many if not all categories. Pl.'s Decl., Ex. 1.

Evidence of Evans' satisfactory performance is also demonstrated by contemporaneous emails General Manager Velten, sent to Williams in 2006 and 2007, giving feedback about Evans' performance. Velten stated in a March 19, 2007 email that all business goals for 2006 were met or exceed and included several positive comments about Evans. *See e.g.,* Vetlen Dep., Ex. 13 (Vetlen stating "Randy did a great job making this happen in the unit" regarding a program titled "Sowing the Seeds"); *see also, Id.*, Ex. 41 (September 27, 2006 email in which Vetlen stated, *inter alia,* "Evans has [d]one an excellent job integrating 36 new salaried associates. This has and continues to be a major workload driver.")

Further, it is undisputed that Evans never received a below expectations overall performance review during his 36-year employment with Sears until Williams became Plaintiff's supervisor. Finally, Plaintiff's self-assessment in his performance reviews in 2006 and 2007 demonstrates that he believed he was performing at or above a satisfactory level. *See* Williams Dep., Exs. 14 & 17 (Evans rating himself at satisfactory or above in his 2006 Year-End Review

---

[3]      Defendant asserts that Plaintiff's subjective belief about his performance is not sufficient to raise a genuine issue of material fact. However, this only applies at the "pretext" phase of a prima facie case. *See, e.g., Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986) (plaintiffs feelings of competence and confidence in her skills were "subjective personal judgments" insufficient to raise a genuine issue of material fact as to *pretext*). Plaintiff's subjective beliefs are relevant, however, at the first phase of the prima facie case.

17

and 2007 Mid-Year Review). Plaintiff successfully presents a prima facie case.

> 5.      Legitimate Reason.

To demonstrate a legitimate, nondiscriminatory reason for terminating Evans, Sears "must show that the procedure by which [Evans] was terminated was validly and fairly devised and administered to serve a legitimate business purpose." *Dep't of Fair Emp't & Hous. v. Lucent*, 642 F.3d 728, 745-746 (9th Cir. 2011) (*quoting Hanson v. Lucky Stores*, 87 Cal. Rptr. 2d 487, 492 (1999)). "A reason is 'legitimate' if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination.'" *Reid*, 50 Cal. 4th at 520 n.2.

Plaintiff does not dispute that Sears has met its burden under the second phase of the *McDonnell Douglas* test. Indeed, documented poor performance is a reason for termination facially unrelated to Plaintiff's age. *See e.g., Muzquiz v. City of Emeryville*, 79 Cal. App. 4th 1106, 1120-1121 (2000).

> 6.      Pretext.

"A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000)). Circumstantial evidence must be "specific" and "substantial." *Dep't of Fair Emp't & Hous.*, 642 F.3d at 746 (quoting *Godwin v. Hunt Wesson*, 150 F.3d 1217, 1221 (9th Cir. 1998)). An employee cannot meet its burden by simply showing that the employer's decision was "wrong, mistaken, or unwise." *Dep't of Fair Emp't & Hous.*, 642 F.3d at 746 (*quoting Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52 (2000)). "Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

18

its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons." *Dep't of Fair Emp't & Hous.*, 642 F.3d at 746 (quoting *Morgan*, 105 Cal. Rptr. 2d at 670). "[A] plaintiff's showing of pretext, combined with sufficient prima facie evidence of an act motivated by discrimination, may permit a finding of discriminatory intent, and may thus preclude judgment as a matter of law for the employer." *Guz*, 24 Cal. 4th at 361.

Viewing the evidence in the light most favorable to Evans and drawing all justifiable inferences in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), there is sufficient evidence to create a genuine, material dispute regarding whether Sears' stated reason for terminating Evans was a pretext for discrimination.

First, Plaintiff points to the statements made by Williams and Taska which support an inference of discrimination. *See Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995) (even if a stray remark alone is insufficient to withstand summary judgment, such remarks are "certainly relevant" and, with other evidence, "create strong inference of discrimination."). For example, Williams comments that Evans would not be around much longer because he was of retirement age and that Sears needed "younger" HRMs are evidence of discriminatory animus. Although they are not evidence, "which if believed, proves the fact without inference or presumption," *Godwin*, 150 F.3d at 1221 (citation omitted), they constitute circumstantial evidence of discrimination. That is, a reasonable trier of fact could find that these statements were made with discriminatory intent. This is especially so, given that the statements were made by the managers who were responsible for Plaintiff's termination and that Plaintiff was replaced by a much younger employee. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1039-1040 (2005) ("evidence of. . . discriminatory remarks is sufficient to permit a jury to find that animus affected the ultimate hiring decision" when "the person who uttered the

19

discriminatory remark was. . . involved in the decisionmaking process.")

Second, Plaintiff presents evidence that Williams secretly created Plaintiff's PIP and did not inform him that he was on the program until long after it was created. The original PIP review period was October 25, 2006 to December 20, 2006 with an original due date of January 20, 2007.[4] *See* Pl.'s Dep., Ex. 37. Evans testified that "the date [he] first saw the [PIP] was April 27, 2007." Pl.'s Dep. 292:22-293:3. Three former Sears human resource managers testified that it is critical and standard practice to timely communicate with the recipient about the PIP when he or she is first placed on it. *See* Purvis Decl. ¶ 13; Hargrove Dep. 44:23-46:24; Shepherd Decl. ¶ 7. By creating a PIP without informing Evans, Williams violated Sears' HR procedures and standard practice. The Ninth Circuit has acknowledged that an employer's deviation from established policy or practice is evidence of pretext. *See Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir. 2008) (finding that disregarding company polices is evidence consistent with an intent to discriminate); *see also Brennan v. GTE Govt. Sys. Corp.*, 150 F. 3d 21, 29 (1st Cir.1998) ("Deviation from established policy or practice may be evidence of pretext."); *Kotla v. Regents*, 115 Cal. App. 4th 283, 294 n.6 (2004) ("evidence showing . . . that the employer significantly deviated from its ordinary personnel procedures in the aggrieved employee's case, might well be relevant to support (or negate) an inference of retaliation.") This is particularly so because Williams, as a high-ranking Sears HR manager, should have known how to properly administer a PIP, but purportedly did not.[5]

Third, Plaintiff presents evidence which demonstrates that Defendants' reasons for

---

[4]     The PIP time period was extended due to Plaintiff's cancer treatments; however, Williams alleged actions – i.e., not informing Evans of the PIP until well after it was created – still violates Sears' improvement plan process.
[5]     Defendant asserts that Plaintiff was aware that a PIP was created, citing Williams' deposition testimony that in October 2006 Williams discussed the performance improvement plan with Evans. *See* Williams Dep. 117:8-23. That Defendant presents evidence that Plaintiff may have been aware of the PIP only creates a disputed fact on the issue. The court cannot resolve this issue on motion for summary judgment. The conflicting evidence merely gives weight to the fact that a material dispute exists regarding whether the reason for firing Evans was legitimate or a pretext.

termination are inconsistent with the feedback from GM Velten as well as the objective HR

Scorecards. For example, Velten's spring 2007 feedback to Williams for Plaintiff's 2006 year-end

review says Delano's "source and recruit top talent" goals were met, yet on the on the

corresponding Performance Review Williams rated Plaintiff a "2.0 low contributor" and all

comments are negative. *Compare* Velten Dep. 89:4-12; Ex. 13 (email feedback); *with* Williams

Dep. 140:2-7; 199:24-200:7; Exs. 10 (PIP), 14 (Plaintiff's 2006 Year-End Review). Further,

Velten stated that the "Implement Leadership Develop Training Goal" for 2006 was "exceeded."

Yet, plaintiff received 2.0s and negative comments in his 2006 Review and PIP in these

categories. *Id.* Moreover, the objective evidence shows that by the time by the time Williams

terminated Evans, Delano had a 98.39 percent completion percentage for Sears' Code of Conduct

Compliance Training, which was better than the average of 96.63 percent. Siegel Decl., Ex. 26.

As a final example, Williams stated in the end of the PIP that Evans "has been unable [to]

develop an effective recruitment strategy to backfill [a] management opening." However, the

January to August 2007 Scorecards show that the highest number of open positions for salaried

employees was never more than 2 out of 63 positions. Pl. Decl., Ex. 1.

   Fourth, Plaintiff presents evidence which demonstrates that Defendants' reasons for

termination are inconsistent with witness testimony. For example, while Defendants assert that

Evans was indifferent to his job and/or to improving, Plaintiff points to Gutierrez's deposition

testimony, which states: "Randy was known to work 15 or 16 hours a day. Sometimes when the

recognition meetings took place, you'd see him at the 4:00 a.m. meeting, you'd see him at the

6:00 and 7:00 p.m. meeting the same day." Gutierrez Dep. 25:5-8; *see also,* Velten Dep. 109:22

("Randy was always on the job long hours"); *id* at 110:15-17 ("[H]e was making in my opinion,

an effort to improve in the areas that I was directly concerned with."). Defendants also state that

Evans lacked presence on the floor. However, Velten testified that Evans was improving his

21

"[v]isibility on the floor" while on the PIP. Velten Dep. 110:19. Plaintiff also presents evidence to refute Defendants' assertion that Evans did not sufficiently "push back" against Velten. Gutierrez testified that Plaintiff made his opinions known, was not afraid to "battle" Velten, and "held his own." Gutierrez Dep., 36:25-37:25; 106:3-107:9.

The evidence of Taska's and Williams' comments regarding the need for "younger" employees in combination with secretly placing Plaintiff on a PIP in violation with Sears' policy, the contradiction between Plaintiff's PIP/2006 Year-End Review and the objective evidence, along with the remaining relevant evidence[6] is sufficiently specific and substantial to indicate pretext. Because Plaintiff's burden of proof is the same under FEHA and ADEA, Plaintiff has provided enough evidence to defeat Defendants' motions for summary judgment on the age discrimination claims under FEHA and ADEA. *Gross*, 129 S.Ct. at 2351 ("the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action."). Defendants' motions for summary judgment on these claims are DENIED.

B.      Discrimination Based on Disability (Claim Two).

Plaintiff also alleges Sears unlawfully discriminated against him based on his disability in violation of California Government Code section 12940(a).

---

[6]      Some of Plaintiff's remaining evidence; e.g., his own opinion regarding how he was performing and his former supervisors' opinions regarding his performance before the relevant time period, is unavailing. *See Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011(9th Cir.1986) (plaintiff's feelings of competence and confidence in her skills were "subjective personal judgments" insufficient to raise a genuine issue of material fact as to pretext); *see also Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980) ("It is the perception of the *decision maker* which is relevant.")(emphasis added)

Plaintiff also states that there was a "pattern of discriminatory treatment" because  within fifteen months of Williams supervising the seven RRC HRMs, three of the oldest were terminated or "resigned under pressure" and were replaced with employees who were decades younger. In this circuit a sample size of seven people is too small for a jury to make meaningful statistical conclusions about whether a pattern of discrimination exists. *See Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1075-76 (9th Cir. 1986) (sample size of 28 too small); *Palmer v. United States*, 794 F.2d 534, 539 (9th Cir. 1986) (sample size of 13-15 too small); *Morita v. Southern California Permanente Medical Group*, 541 F.2d 217, 220 (9th Cir. 1976) (sample size of 8 too small).

FEHA declares "as a public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of. . .  physical disability, mental disability, [or] medical condition." Cal. Govt.Code, § 12920. California Government Code, section 12940(a) provides that it is unlawful "[f]or an employer, because of. . . physical disability, mental disability, [or] medical condition. . . to refuse to hire or employ the person. . . or to bar or to discharge the person from employment. . .  or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."

Disability discrimination claims also have shifting burdens of proof. A plaintiff has the initial burden to prove by a preponderance of evidence a prima facie case of disparate treatment; i.e., a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). This may be accomplished with direct evidence of discriminatory intent. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir.2003). A plaintiff may also establish a prima facie case of disability discrimination through circumstantial evidence. To do so, the plaintiff must show that he/she: (1) suffers from a disability; (2) is a qualified individual; and (3) was subjected to adverse employment action because of the disability. *Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007); *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236 (1997); *see McDonnell Douglas Corp.*, 411 U.S. at 802. Plaintiff must come forward with some admissible facts capable of demonstrating a causal nexus between his disability and his termination. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Caldwell v. Paramount Unified School Dist.*, 41 Cal. App. 4th 189, 197 (1995). Failure to do so is fatal to his claim. *Id.*

If the plaintiff makes a prima facie case, the burden shifts to the defendant, "who must

offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (1994). The burden then shifts back to the plaintiff and the plaintiff "must produce 'specific, substantial evidence of pretext.'" *Id.* at 890 (*quoting Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983)).

"[W]hen evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a *McDonnell Douglas* type presumption." *Wallis*, 26 F.3d at 890–891.

1.      Plaintiff's Disability Claim Cannot Survive Summary Judgment.

Plaintiff's only of discrimination evidence for his disability claim is Williams' and Taska's criticism of him for not attending the spring 2007 HR meeting, despite knowing that he had to remain in California for cancer treatment. For example, Wade testified that at the meeting Williams stated: "one of us isn't here because he says he's sick." Wade. Dep. 80:16-19. This is the most unambiguous statement offered by Plaintiff regarding his disability; however, it cannot be considered direct evidence because Wade further testified that she did not know what Williams meant when she made this statement. *Id.* at 81:14-82:3. Even if these statements are considered relevant "stray remarks," they are insufficient to survive summary judgment. *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990) ("[S]tray remarks are insufficient to establish discrimination.").

Plaintiff offers no other direct or circumstantial evidence to show how his disability was linked to his termination. In fact, the evidence demonstrates the opposite, i.e., there was not a link between Plaintiff's disability and his termination. It is undisputed that Plaintiff requested and was granted leave pursuant to the Family Medical Leave Act (although he did not take it); Plaintiff was released by his medical provider from treatment in March 2007 (six months prior to his termination); and no evidence is presented that after Plaintiff's release anyone at Sears was aware

24

that he was purportedly still disabled. Sears could not terminate Plaintiff based on his disability, if

Sears was not aware that Plaintiff was still purportedly disabled at the time of his termination.

Defendants' motion for summary judgment is GRANTED regarding Plaintiff's disability

discrimination claim.

C.      Punitive Damages.

Defendants assert that Plaintiff's claim for punitive damages cannot survive summary

judgment because Williams was not an officer or director of the Defendant-entities during the

relevant time period, and neither were Taska or Bob Churchill (a Divisional Vice-President who

signed off on Plaintiff's termination). Defendants further assert that Plaintiff does not show with

clear and convincing evidence that these employees acted with fraud, oppression, or malice.

Plaintiff rejoins that there is evidence for a jury to conclude that each were managing agents and

each acted with the requisite intent.

1.      Managing Agents.

"[T]he Legislature intended the term "managing agent" to include only those corporate

employees who exercise substantial independent authority and judgment in their corporate

decisionmaking so that their decisions ultimately determine corporate policy." *White v. Ultramar,*

*Inc.*, 21 Cal. 4th 563, 566-567 (1999). "[T]he mere ability to hire and fire employees [does not]

render[] a supervisory employee a managing agent." *Id.* "The scope of a corporate employee's

discretion and authority. . . [is] a question of fact for decision on a case-by-case basis." *Id.*

Under this standard, the manager in *White* was considered a managing agent because she

supervised eight retail stores and sixty-five employees and had been delegated most of the

responsibility for running these stores. *Id.* at 577. Here, there is evidence for a jury to find that

Churchill, Taska, and Williams had at least as much discretion and authority as the *White*

manager. Williams served as AHRM, a position based out of corporate headquarters with "nationwide responsibility" and seven or eight HRMs reporting to her. Williams Dep. 17:11-16; 18:8-11.  Her job description states that the AHRM "[a]ssist[s] business management[] in developing, designing, and implementing programs to support their organizations." Decl. Siegel, Ex. 24. Taska was Williams' boss and held a higher position and even more responsibility and discretion than Williams. Taska Dep. 11:22-25; 15:4-9. As HR Director of Logistics, she was in charge of all forty-two distribution centers for Sears and Kmart. *Id.* at 12:11-12. Taska admitted she "made protocol." *Id.* at 122:8. She also set corporate policy, exemplified by the monthly HR Scorecard and audit program which she implemented on her own after determining that the department needed greater levels of accountability. *Id.* at  69:5-7. Finally, Churchill was part of Sears's "executive leadership team," the top 200 executives in the company out of approximately 290,000 total employees. Dep. of Robert Churchill, 82:9-13. As part of this team he was involved in "establish[ing] strategy or initiatives to improve the business." *Id.* at 82:21-24. Accordingly, Plaintiff presents sufficient evidence for a jury to decide whether Williams, Taska and Churchill were managing agents of Sears.

        2.     <u>Acting With Fraud, Oppression, or Malice.</u>

Despite that Plaintiff's punitive damage claim is not barred by Defendants' managing agent argument, Evans must still establish "through clear and convincing evidence" that Defendants acted with "oppression, fraud, or malice" for his punitive damages claim to survive summary judgment. Cal. Civ. Code § 3294. "Clear and convincing evidence" is evidence "sufficient to support a finding of high probability." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir.1992). "The evidence must be so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind." *Harbison v. American Motorists Ins. Co.*, 636 F.Supp.2d 1030 (E.D. Cal. 2009). The "clear and convincing" evidentiary standard

1    for punitive damages under California law applies to every stage of the litigation process,

2    including summary adjudication. *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219 (C.D. Cal.

3    2002); *Spinks v. Equity Residential Briar-wood Apts.*, 171 Cal. App. 4th 1004 (2009). "Malice" is

4    defined as "conduct which is intended by the defendant to cause injury to the plaintiff or

5    despicable conduct which is carried on by the defendant with a willful or conscious disregard for

6    the rights and safety of others." Cal. Civ. Code § 3294(c)(1). "Oppression" is defined as

7    "despicable conduct that subjects a person to cruel and unusual hardship in conscious disregard of

8

9    that person's rights." Cal. Civ. Code § 3294(c)(2). "Used in its ordinary sense, the adjective

10   'despicable' is a powerful term that refers to circumstances that are 'base,' 'vile' or

11   contemptible.'" *Shade Foods v. Innovative Products Sales & Marketing, Inc.*, 78 Cal. App. 4th

12   847, 890 (2000).

13

14          Although Plaintiff raises issues of fact as to his discrimination claim, he fails to carry his

15   burden to establish his demand for punitive damages. The evidence is not "so clear as to leave no

16   substantial doubt" that Defendants acted with intent to cause injury to Evans, or acted with a

17   conscious disregard for Plaintiff's rights. When viewed in a light most favorable to Evans, the

18   evidence demonstrates that Williams may or may not have terminated Evans because of his age.

19   For example, it is alleged that Williams made discriminatory comments, but the witnesses who

20   allegedly heard her make these statement believed she may not have meant them in a

21   discriminatory way. *See e.g.,* Gutierrez Dep., 124:12 (stating Williams' comments "could have

22   meant numerous things."). Further, it is alleged that Williams secretly created Plaintiff's PIP

23   against Sears' policy, but Williams denies this. Williams Dep. 117:5-9. Moreover, Plaintiff

24   admits that he received a disciplinary memo and some negative feedback regarding his

25   performance even before Williams became his supervisor. *See e.g.,* Pl. Dep., 172:12-173:11. As

26   such, when viewed under a heightened standard, the Court cannot find that the evidence is

27   27

28

"sufficiently strong to command the unhesitating assent of every reasonable mind." A finding of discriminatory motive based on age requires the fact-finder to make a credibility finding favorable to Evans. Such a determination is far from clear. Further, a punitive damage claim against Taska and/or Chruchill is even more unclear as each had far less interaction with Plaintiff and very little evidence of their involvement in this case is presented.

Accordingly, Plaintiff may not pursue an award for punitive damages. Defendants' motion for summary judgment on Plaintiff's punitive damages claim is GRANTED.

V. <u>CONCLUSION.</u>

For the reasons set forth above:

1. Defendants' motion for summary judgment on Plaintiff's FEHA age discrimination claim is DENIED.

2. Defendants' motion for summary judgment on Plaintiff's ADEA age discrimination claim is DENIED.

3. Defendants' motion for summary judgment on Plaintiff's FEHA disability discrimination claim is GRANTED.

4. Defendants' motion for summary judgment on Plaintiff's punitive damage claim is GRANTED.

IT IS ORDERED.

Dated: December 8, 2011     \_\_/s/ Lawrence J. O'Neill\_\_\_\_

Lawrence J. O'Neill
United States District Judge